## Meade, et al. v. Steele Coal Company, et al.

(Decided June 18, 1918.)

## Appeal from Pike Circuit Court.

1. Public Lands—Patents—Invalidity.—An attack upon a patent as invalid because of survey made before date of issue of warrant, held not supported by the evidence.

2. Boundaries—Evidence—Judgment of Chancellor.—In an action to enjoin trespass on coal lands, the evidence of location of senior patent under which defendants claimed being conflicting, the judgment of the chancellor thereon will be upheld.

3. Boundaries—Evidence—Injunction.—Under such location of defendants' senior patent, plaintiffs had title to only about two acres of land which was not covered by defendants' senior patent, and they were not entitled to the injunctive relief sought except as to this two-acre tract.

P. B. STRATTON and WILLIAM AKERS for appellants.

EDWARD W. PENDLETON, W. G. FLEU, E. D. STEPHENSON, ALLIE W. YOUNG and EDWARD C. O'REAR for appellees.

OPINION OF THE COURT BY JUDGE CLARKE—Affirming in part and reversing in part.

On September 16, 1913, appellant, W. G. Meade, instituted this action in the Pike circuit court to enjoin appellee, Steele Coal Company, from mining and removing coal from thirty and three-fourths acres of land, the title to which was claimed by Meade under a patent granted to him by the Commonwealth August 20, 1912. The Steel Coal Company answered, claiming the right to mine coal from the land described in the Meade patent under a lease from the Elk Horn Fuel Company, which company was made a party defendant and answered, claiming title to the land through mesne conveyances from Charles Trout, to whom a patent for 190 acres of land was granted by the Commonwealth in 1846. Defendants also claimed title by adverse possession and attacked Meade's patent as being void upon its face. The allegations of the several answers were traversed by reply, proof was taken, and, upon submission, judgment was entered dismissing the petition; and plaintiffs have appealed.

The two questions for decision are: Whether Meade's patent is void, and what is the proper location of the Trout patent.

1. Although this is plainly a collateral attack upon the patent, it is nevertheless authorized, since the basis of the attack is that the patent shows upon its face that it is void.

The patent recites that it was issued by virtue and in consideration of part of a Pike county court land warrant No. 1716, issued to W. G. Meade, assignee of P. B. Stratton, dated December 2, 1911, and a survey made thereunder of date October 27, 1911. It will be noticed that it is stated in the patent that the survey was made more than a month prior to the issuance of the warrant under which the entry and survey were authorized; and it is insisted for appellees that a valid survey could not be made in advance of the issuance of a warrant authorizing it. In support of this contention, we are referred to Mason v. Fuson, 171 Ky. 11, wherein, in discussing the validity or invalidity of certain Thickston entries and surveys under section 4703, Kentucky Statutes, it is said that: "the entries and surveys are, therefore, as shown by this record, lacking in the first essential to their validity. A valid entry and survey can not be made, of course, until a warrant authorizing same has been issued by the county court." In that case there was no proof that any warrant, authorizing the entries and survey, had ever been issued, and the question whether a warrant could be issued after the survey had been made was not there considered. All that was decided was that a valid entry and survey could not be made in the absence of a warrant authorizing same. While we see no reason now to doubt the accuracy of the statement that a warrant is the first essential to the validity of an entry and survey, and that they can not be made until a warrant authorizing same has been issued by the county court, it is not necessary to a decision of this case, as it was likewise unnecessary in the decision in Mason v. Fuson, to decide whether or not a warrant issued subsequent to the entry and survey could give validity to the previously made entry and survey, and we prefer to leave that question open.

While the patent to Meade recites that it was granted upon warrant No. 1716, issued December 2, 1911, and survey made thereunder October 27, 1911, a certified copy of the original warrant was introduced, and it shows that it was, in fact, issued March 22, 1911, to P. B. Stratton and assigned by Stratton June 27, 1911, to Meade.

It is, therefore, conclusively established that the recitation in the patent, upon which appellees rely to prove its invalidity, is not a correct statement of the facts, as appears from the warrant which is recorded in the land office and attached to the plat and certificate upon which the patent issued. There is, therefore, no basis for the contention that the Meade patent is void.

2. Having decided that the Meade patent is not void and it being conceded that it covers the land in controversy, we now come to a decision of the question of whether or not the older Trout patent, under which appellees claim, covers the land in controversy, which is purely a question of fact.

This question depends almost entirely upon the proper location of the beginning corner of the Trout patent, described as "a small oak upon a fork point near the top of the dividing ridge between Hurricane and Sandy river." Maps are before us of surveys made for plaintiffs and defendants showing the topography of the land and the locations claimed by the parties, and while the locations of the patent are quite different, there are no essential differences topographically, and the top of the dividing ridge between Hurricane and Sandy river is shown alike on both maps; the small oak called for upon a fork point near the top of this ridge being located upon different spurs or fork points leading off from the dividing ridge.

For plaintiffs, an oak standing on the side and near the top of a spur some 300 feet from the top of the dividing ridge is claimed to be the beginning corner called for, while, for the defendants, a large oak stump, located upon another spur, or fork point, and only about 100 feet from the top of the dividing ridge, is claimed to be the beginning corner. It will be seen that the oak stump, claimed by defendants to be the beginning corner, more nearly accords with the description that it is near the top of the dividing ridge than does the small oak for which plaintiffs contend, and, from the maps, the spur upon which the oak stump is located seems to us to more nearly answer the description of a fork point. Since this spur approaches more nearly to and points more directly at a fork in the Low Gap or Damron branch than does the spur upon which is located the small oak. And the fact that this survey

was made in 1846 suggests the probability that the oak then described as a small oak would now be a tree of the dimensions of the oak stump rather than the oak claimed by plaintiffs, now about twenty inches in diameter.

The adoption of the oak stump rather than the oak tree is demanded by the evidence of Judge Tobias Wagner, his son, N. L. Wagner, John Stevens, Thomas Stevens and John S. Lowe, who testified that different portions of the land in controversy, which would be included in the Trout survey if it began at the oak stump claimed as the beginning corner by defendants, and would be excluded if it began at the small oak tree claimed by plaintiffs, had been claimed and were recognized in the neighborhood as belonging to defendants' predecessors in title under the Trout patent, and that these claimants had, at different times, removed timber from and cultivated portions of this land.

We also think that the evidence as to the proper location of the Lazarus Damron fifty-acre survey, which is senior to and binds upon the Trout survey from the south, the two surveys having several common calls, supports the contention of defendants, since the plaintiff's location of that survey places an oak stump corner on the west rather than on the east side of Hurricane creek, and an elm corner nearly 200 feet below the residence of Lazarus Damron on Low Gap or Damron branch, whereas, that patent necessitated a location of the oak stump on the east side of Hurricane creek and the elm opposite the residence of Lazarus Damron, as does defendants' location of it.

The only undisputed corner in the Charles Trout survey is an ash upon a ridge upon the other side of the survey from the beginning corner and is not helpful in locating the disputed lines, since in reversing the lines of the survey and running from this ash to the beginning corner, the reversed calls run out at a point between and nearly equally distant from the locations claimed by the parties and the lines do not seem to have been run out on the ground the other way from the ash to the beginning corner.

For the plaintiffs, it is claimed that the location asserted by them accords more nearly in shape to the recorded plat of the original survey than does that of the

location claimed by defendants, but there is little difference in the shape of the two maps, certainly not enough to warrant the selection of one location rather than the other, and the real difference between the locations is that that claimed by plaintiffs is south of that claimed by defendants about the distance of the width of plaintiffs' survey, and plaintiffs' location seems to us to rest upon an unwarranted shifting toward the south, not only the beginning corner of the Trout survey but also the lines of the Lazarus Damron fifty-acre survey, the James Damron seventy-five acre survey, and the Pike County Seminary survey, all of which are older than the Trout survey.

The evidence of the surveyors for both plaintiffs and defendants, as well as that of another surveyor, Mr. Amick, with reference to how the respective surveys conform to the lay of the land is rather persuasive, although not at all conclusive, of the correctness of the defendants' location of the Trout survey. The evidence of the plaintiff, W. G. Meade, his brother, John L. Meade, G. L. Justice and Isaac Luster, especially the last named, tends strongly to support plaintiffs' contention as to the proper location of the Trout survey, and plaintiffs rely especially upon the fact that Bud Stevens and his son, Ira Stevens, who, at one time, owned a part of the Trout survey, made a survey of eleven acres in 1905, beginning at the oak claimed by plaintiffs and described it as the beginning corner of the Trout survey, and that in several conveyances in defendants' chain of title to other lands this oak is referred to as a corner of the Trout survey, but these facts, while evidence favorable to plaintiffs' contention, are not at all conclusive.

Upon all of the evidence, which it will be seen is quite conflicting, we rather incline to the opinion of the chancellor that the location claimed by defendants is correct, although our minds are not without some doubt upon the question, and under such circumstances there can be no doubt of our duty to uphold the decision of the chancellor. Shelton v. Shelton, 167 Ky. 167; Salyers v. Elk Horn Land & Imp. Co., 167 Ky. 111; Gragg v. Barton's Admx., 161 Ky. 210; Liebel v. Tandy, 146 Ky. 101; Stone v. Middleton, 144 Ky. 284; Gilliam v. Guffey, 142 Ky. 631; Williams v. Paintsville Natl. Bank,

143 Ky. 281; Eversole v. Holliday, 131 Ky. 202, and many other cases.

3. It will not be necessary for us to consider the defendants' claim to any of the land in controversy under a right of preemption or adverse possession, since the location of the Trout patent establishes their title to all of the land involved except about two acres of the land covered by the Meade patent and outside of the Trout patent, and as to this small tract, which is located in the extreme northwestern corner of the Meade survey, and adjoining the William Weddington 225-acre survey, the Polly R. Price survey, and the Trout survey, the defendants have no sort of claim. Therefore, as to that part of the land in controversy plaintiffs are entitled to the relief asked for, and to that extent the judgment of the chancellor is erroneous and will be reversed.

Wherefore, the judgment is affirmed in so far as it sustains the location of the Trout survey, claimed by defendants, and reversed in so far as it denied plaintiffs the relief they sought with reference to the small tract of land in the northwestern corner of the Meade survey and not included in the Trout patent as located.