RENDERED: APRIL 28, 2023; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0385-MR

FIRST SPECIALTY INSURANCE
CORP.                                                          APPELLANT

|              | APPEAL FROM JEFFERSON CIRCUIT COURT |
|--------------|-------------------------------------|
| v.           | HONORABLE ERIC JOSEPH HANER, JUDGE  |
|              | ACTION NO. 16-CI-006010             |

ALLTRADE PROPERTY MANAGEMENT
AND MOTORISTS MUTUAL INSURANCE
COMPANY

                                                             APPELLEES

OPINION
AFFIRMING IN PART,
REVERSING IN PART, AND REMANDING

** ** ** ** **

BEFORE: JONES, KAREM, AND LAMBERT, JUDGES.

KAREM, JUDGE: First Specialty Insurance Corporation ("First Specialty")

appeals from the Jefferson Circuit Court's grant of summary judgment to Motorists

Mutual Insurance Company ("Motorists") and to Alltrade Service Solutions and

Alltrade Property Management ALC (collectively "Alltrade"). The judgment resolved a dispute between the two insurance companies over their liability for damages in a wrongful death suit brought against Alltrade and two of its employees. Upon review, we affirm the circuit court's holding that Alltrade and its employees qualify as insureds under the First Specialty policy and reverse its holding that the two policies contain mutually repugnant excess clauses. The case is remanded for entry of an order reflecting that the First Specialty policy contains a nonstandard escape clause that takes precedence over the excess clause in the Motorists policy.

## FACTUAL AND PROCEDURAL BACKGROUND

Victoria Gardens is an apartment complex in Louisville, Kentucky. In 2014, the owner of the complex, Whispering Brook Acquisitions, LLC ("Whispering Brook"), entered into a Property Management and Service Agreement ("Agreement") with Alltrade to manage and maintain the property. Under the terms of the Agreement, Whispering Brook retained Alltrade "to act as exclusive agent to lease, operate, manage and service" Victoria Gardens.

On April 15, 2016, Jeremy Tanzilla, an employee of Alltrade, was on his way to perform maintenance on an air conditioner at a unit in Victoria Gardens.

Tanzilla was driving his own truck and towing a trailer.[1]  After speaking with his supervisor, Bruce Key, also an employee of Alltrade, Tanzilla made a right turn onto a street in the complex and collided with Tyshawn Nuby, Jr., a five-year-old child.  Tragically, Tyshawn later died as a result of his injuries.

On December 5, 2016, the child's parents, Ceara McDaniel and Tyshawn Nuby, Sr., brought a wrongful death action in Jefferson Circuit Court, individually and as the administrators of his estate.  Whispering Brook, Victoria Gardens, Alltrade, Key, and Tanzilla were named as defendants.

Whispering Brook was a named insured on a commercial general liability policy with First Specialty.  The primary named insured, Amalgamated Loss Management, LLC, was a defendant in the circuit court action but is not a party to this appeal.

Alltrade was insured under a commercial general liability policy with Motorists, which defended Alltrade, Tanzilla, and Key throughout the lawsuit.  Motorists also sought coverage for Alltrade from First Specialty, without success.  On July 10, 2018, Motorists filed a motion seeking to intervene in the Jefferson Circuit Court action in order to determine the rights and duties and priority of coverage between Motorists and First Specialty for the damages alleged against Alltrade, Tanzilla, and Key.  On September 14, 2018, Alltrade filed a cross-claim,

_____

[1] The appellant's brief claims the trailer was owned by Victoria Gardens, whereas the circuit court's order states that Alltrade and Motorists both assert the trailer was owned by Alltrade.

seeking similar relief and coverage from First Specialty. Motorists, Alltrade, and First Specialty ultimately all filed motions for summary judgment to determine whether First Specialty had a duty to defend and indemnify Alltrade, Tanzilla, and Key under the terms of its policy with Whispering Brook and, if so, whether First Specialty's coverage was primary or excess over coverage provided by Motorists.

The circuit court entered an order on December 11, 2019, granting judgment in favor of Motorists and Alltrade. It ruled that Alltrade, Tanzilla, and Key were entitled to coverage under the First Specialty policy, and that Motorists and First Specialty shared primary liability for the loss and were required to contribute equal shares to defend and indemnify Alltrade, Tanzilla, and Key.

The defendants ultimately settled the underlying action with the plaintiffs. First Specialty reserved its right to recoup from Motorists the amount it paid in the underlying settlement and Motorists reserved its right to recoup from First Specialty a portion of its defense fees. On March 16, 2022, at First Specialty's request, the circuit court entered a final judgment consistent with the December 11, 2019, order. This appeal by First Specialty followed.

**STANDARD OF REVIEW**

When we review a grant of summary judgment, we are required to determine:

> whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law.

> Because summary judgment involves only legal questions and the existence of any disputed material issues of fact, an appellate court need not defer to the trial court's decision and will review the issue *de novo*.

*Lindsey v. Board of Trustees of University of Kentucky*, 552 S.W.3d 77, 87-88 (Ky. App. 2018) (internal quotation marks and citations omitted).

Similarly, because the "[i]nterpretation and construction of an insurance contract is a matter of law, we review the raised issues *de novo*, giving no deference to the trial court." *Isaacs v. Sentinel Insurance Company Limited*, 607 S.W.3d 678, 681 (Ky. 2020) (internal quotation marks and citations omitted).

The following principles govern the interpretation of an insurance contract:

> When the terms of an insurance contract are unambiguous and reasonable, they will be enforced. Policy exceptions and exclusions are strictly construed to make insurance effective. Any ambiguities in an insurance contract must be resolved in favor of the insured, but this rule of strict construction certainly does not mean that every doubt must be resolved against the insurer and does not interfere with the rule that the policy must receive a reasonable interpretation consistent with the plain meaning in the contract.

*Tower Insurance Company of New York v. Horn*, 472 S.W.3d 172, 173-74 (Ky. 2015) (citations omitted).

## ANALYSIS

**A. The circuit court did not err in determining Alltrade, Tanzilla, and Key were insureds under the First Specialty policy**.

First Specialty challenges the circuit court's conclusion that Alltrade and its employees, Tanzilla and Key, all qualified for coverage as "insureds" under the First Specialty policy with Whispering Brook.

The portions of the First Specialty policy which are relevant to this question consist of the Commercial General Liability Coverage Form ("the CGL Form") and an Endorsement for Hired or Non-owned Auto Liability ("the Non-owned Auto Endorsement").

The CGL Form contains two pertinent sections: Section I contains Coverage A, which defines bodily injury and property damage liability. It provides in part:

> **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY**
>
> **1. Insuring Agreement**
>
> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply[.]

. . .

b. this insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2) The "bodily injury" or "property damage" occurs during the policy period[.]

The parties do not dispute that this case involved a "bodily injury" caused by an "occurrence" in the "coverage territory" during the "policy period."

Section I of the CGL Form also contains a series of exclusions to which the insurance does not apply, including one for Aircraft, Auto, or Watercraft ("the Auto Exclusion"). It provides as follows:

This insurance does not apply to:

. . .

**g. Aircraft, Auto or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured.

. . .

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage"

-7-

involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

Section II of the CGL Form contains definitions of who is an insured,

which includes the following:

b. Any person (other than your "employee" or "volunteer worker"), or any organization **while acting as your real estate manager**.

(Emphasis supplied.)

The Non-owned Auto Endorsement significantly modifies the policy.

For purposes of the Endorsement, an insured is defined as

1. You for any "covered auto." ["You" is defined elsewhere in the policy as the Named Insured shown in the Declarations; Whispering Brook is a Named Insured.]

2. Anyone else while using **with your permission** a "covered auto."

(Emphasis supplied.)

A "covered Auto" is defined to include a "Non-owned auto" which means

any "auto" you do not own, lease, hire, rent or borrow **which is used in connection with your business**. This includes "autos" owned by your "employees," your partners (if you are a partnership), your members (if you are a limited liability company), or your "executive officers," or members of their households, but only while used in your business.

(Emphasis supplied.)

**i. Tanzilla is an "insured" under the Non-owned Auto Endorsement**.

-8-

The circuit court found that Tanzilla qualified as an insured under the Non-owned Auto Endorsement, because he was using a "covered auto" with the permission of a named insured, Whispering Brook, when the loss at issue occurred. Tanzilla's truck qualified as a "covered auto" because it was not owned, leased, hired, or borrowed by a named insured (Whispering Brook) and because Tanzilla was using his truck "in connection with [the] business" of a named insured (Whispering Brook) within the "coverage territory."

Under Kentucky law, "the burden is on the beneficiary to establish . . . by some evidence, his right to recover." *North American Acc. Ins. Co. v. White*, 258 Ky. 513, 515, 80 S.W.2d 577, 578 (1935). First Specialty argues that the circuit court erroneously shifted the burden of proof to First Specialty to prove Tanzilla was not an insured, because the circuit court improperly assumed that Tanzilla was using his truck 1) with Whispering Brook's permission and 2) in connection with Whispering Brook's business.

In addressing whether Tanzilla was using his vehicle with the permission of Whispering Brook, the circuit court stated in a footnote of its order: "Nothing in the record suggests that Whispering Brook ever objected to Alltrade's practice of allowing Tanzilla to use his own personal truck in carrying out his duties at Victoria Gardens, even though it had the ability to disallow such a

practice under the terms of its property management and service agreement with Alltrade."

The circuit court's approach recognized that, under the broad terms of the Agreement, Whispering Brook had delegated its authority to allow Tanzilla to use his personal vehicle to Alltrade. This delegation may be express or implied. *Third Nat'l Bank of Ashland v. State Farm Mut. Auto Ins. Co.*, 334 S.W.2d 261, 262-63 (Ky. 1960), *superseded on other grounds by statute as noted in Lewis by Lewis v. West American Ins. Co.*, 927 S.W.2d 829, 835 (Ky. 1996).

> [T]he named insured's grant of authority to the original permittee to delegate to others need not be expressed, but may be implied from the broad scope of the initial permission or from the attending circumstances and the conduct of the parties, and a factual determination must be made in each case to determine whether the scope of the initial grant was broad enough to include an implied authority to delegate to another and thus render the latter an additional insured.

*American Mut. Fire Ins. Co. v. Reliance Ins. Co.*, 233 S.E.2d 114, 117 (S.C. 1977).

Whispering Brook's Agreement with Alltrade gave Alltrade virtually complete control over its own employees and independent contractors. The Agreement required Alltrade to "have in its employ or under independent contract at all times a sufficient number of persons to enable it to properly, adequately, safely, and economically manage, operate, maintain and account for the Property." The Agreement gave Alltrade the power to determine whether to use its own

employees or contracted labor: "Alltrade shall utilize its employees when practicable and/or supervise contracted labor such as electricians, plumbers, maintenance, pest control and similar on-going activities. These services, based on market rates, will be invoiced by Alltrade and will be paid to Alltrade from the Operating Account with a full accounting to the Owner [Whispering Brook]." The Agreement specified that "[a]ll matters pertaining to employment, contracting, supervision, compensation, promotion and discharge of such employees of contractors shall be the responsibility of Alltrade." In giving Alltrade virtually sole authority to control its employees and contracted labor in the management of the apartment complex, Whispering Brook gave implied permission to Alltrade to allow its employees to use their personal vehicles. Alltrade's decision to allow Tanzilla to use his own vehicle at work was well within the scope of the extensive powers delegated to Alltrade by Whispering Brook in the Agreement.

First Specialty argues that this determination is not in accordance with the concept of permission set forth in *American National Fire Insurance Company v. Aetna Casualty and Surety Company*, 476 S.W.2d 183 (Ky. 1972), and *Henderson v. Selective Insurance Company*, 242 F. Supp. 48, 51 (W.D. Ky. 1965), *aff'd*, 369 F.2d 143 (6th Cir. 1966). In the first case, an employee was furnished with a vehicle by his employer to use in the business to drive to and from work. The employee allowed his son to use the vehicle to drive to his job, which

was entirely unrelated to the business of his father or his father's employer. The son took the vehicle to a garage for repairs authorized by the father's employer and was involved in an accident while driving the loaner vehicle provided to him by the garage. The employer's insurance policy would cover the loss, provided the actual use of the automobile was by the named insured (the employer) or with the employer's permission. *American Nat'l Fire Ins. Co.*, 476 S.W.2d at 186. The evidence established that the employer was aware the car had been used by the son outside the employer's business but had not objected. There was no evidence, however, that the employer had granted express permission for the son's use or that it knew the extent to which the son was using the car. The Court held that this was not sufficient to qualify as permission for purposes of coverage under the insurance policy, because "[m]ere knowledge of the unauthorized use of a company's vehicle is not sufficient to give consent for use under the terms of this policy. Under the . . . 'Omnibus Clause' permission to operate the vehicle may be implied, but as a general rule permission to an employe[e] to use his employer's vehicle does not encompass substantial deviations from the purpose of the permission." *Id.*

In the other case relied upon by First Specialty, a car salesman was given permission by his employer to take one of its cars out of town to visit relatives and possibly sell the car to his brother-in-law, who had expressed an

interest in it. The brother-in-law was involved in an accident while driving the vehicle. As with the policy in *American National Fire Insurance Company*, the employer's insurance policy provided coverage to any person using the automobile with the permission of the insured. The Sixth Circuit Court of Appeals ruled that the policy did cover the brother-in-law's accident, because "permission was given to operate the car for a purpose incidental to the owner's use of the car. The temporary operation under conditions so natural as in this case can reasonably be assumed to be expected by the owner and thus embraced within the authority conferred on [the employee] by his employer." *Henderson*, 242 F. Supp. at 51.

First Specialty argues that these cases stand for the proposition that absent actual knowledge that Whispering Brook knew Tanzilla was using his personal vehicle, there is no evidence that Whispering Brook gave permission for such use to either Tanzilla or Alltrade. But actual knowledge is not a prerequisite because such permission may be inferred "from the broad scope of the initial permission or from the attending circumstances and the conduct of the parties[.]" *American Mut. Fire Ins. Co.*, 233 S.E.2d at 315. In the first case, the son's use of the vehicle was not within the scope of the initial permission from the employer, even though the employer had actual knowledge that the son used the car on occasion, because it deviated completely from the purpose of that permission, which was for the father to use the vehicle to commute to work. In the

second case, the brother-in-law's use of the vehicle was within the scope of the original permission, which was given on the understanding that the brother-in-law might purchase the car, in furtherance of the car dealer's business. Tanzilla's case falls squarely into this second category. There is no dispute that under the express terms of the Agreement, Whispering Brook delegated its authority over the supervision of employees and independent contractors performing maintenance at Victoria Gardens to Alltrade. It was reasonably foreseeable that as part of its supervisory authority, Alltrade would permit its employees to drive their own vehicles at work. The breadth of the Agreement's terms fully supports the circuit court's conclusion that Whispering Brook gave implied permission to Alltrade to allow its employees or contractors to use their own vehicles at work.

First Specialty also challenges the circuit court's determination that Tanzilla's truck was "used in connection with" Whispering Brook's business, thereby qualifying as a "covered auto" under the Non-owned Auto Endorsement. As set forth previously, the Endorsement's definition of a covered auto includes a "non-owned auto," which in turn is defined as any auto which Whispering Brook did not "own, lease, hire, rent or borrow" which was "used in connection with [Whispering Brook's] business." The definition includes, but is not confined to, autos owned by Whispering Brook's employees, partners, members, executive

officers, or members of their households, but only when the auto is used in Whispering Brook's business.

The circuit court held that the phrase "in connection with your business," which is not defined anywhere in the policy, was ambiguous. It agreed with Motorists and Alltrade's contention that the phrase was "broad enough to include the use of an auto by an employee in the course and scope of his employment with a contractor that has been hired by a named insured to conduct the business of the named insured." The circuit court observed that "First Specialty cannot deny that Whispering Brook's business involved the types of activities performed by Alltrade because it never would have hired Alltrade to perform those activities if they had no connection to its business." Relying on the rule of construction that any ambiguity is to be resolved in favor of granting coverage, the circuit court held that Tanzilla was using his vehicle in connection with Whispering Brook's business for purposes of coverage under the Non-owned Auto Endorsement.

First Specialty argues that the phrase "in connection with your business" is not ambiguous and that the circuit court construed it far too broadly to encompass what it characterizes as a tangential relationship between Tanzilla's vehicle and Whispering Brook. First Specialty has listed a series of cases, primarily from other jurisdictions, which have found that the phrase "in connection

with your business" in an insurance policy is not ambiguous. It has focused particularly on *Ohio Security Insurance Company v. Rockford Automotive, Inc.*, 509 F. Supp. 3d 960, 962 (W.D. Ky. 2020). In *Rockford*, Pizzonia, an employee of Rockford Automotive, a mechanic shop, sold a vehicle to Jackson. Jackson entrusted the vehicle to Henderson, who while driving the vehicle struck and killed a motorcyclist, Walker. Walker's estate brought a wrongful death suit against Pizzonia, Rockford Automotive, Jackson, and Henderson. Rockford Automotive was the named insured on a business automobile policy which contained similar coverage to the First Specialty policy for autos that Rockford did not own, lease, rent, or borrow that were used in connection with Rockford's business. The federal district court held that the coverage would not apply because it required a connection between the use of the vehicle at the time of the accident and Rockford Automotive's garage business which was completely lacking. *Id*. at 966.

Although the *Rockford* court did not find the phrase "in connection with your business" to be ambiguous, its reasoning completely supports the circuit court's holding in the case before us. Whispering Brook is the owner of an apartment complex which generates revenue from the rental of residential units. Whispering Brook delegated the day-to-day running of this business entirely to Alltrade in their Agreement. When Tanzilla drove his truck to maintain an air conditioner at one of the rental units, he was using the vehicle in connection with

-16-

and in furtherance of Whispering Brook's business. By contrast, Henderson's use of the vehicle had absolutely nothing to do with Rockford Automotive's business.

First Specialty further argues that coverage is unavailable because Tanzilla was an employee of Alltrade, whereas the "in connection with your business" language in the Endorsement was intended solely to protect the named insured corporation from vicarious liability for the negligent operation of motor vehicles by its own employees using non-owned vehicles within the scope and course of their employment. Although many of the cases analyzing non-owned auto endorsements involve employees of the insured, the language of the Endorsement does not confine coverage to employees of the insured. The following cases cited by First Specialty also take a more expansive view of the scope of these endorsements.

In *Nuvell National Auto Finance, LLC v. Monroe Guaranty Insurance Company*, 736 S.E.2d 463, 469 (Ga. App. 2012), Nuvell, an auto financing company, had a contract with a repossession management company, Renaissance. Renaissance's commercial auto policy limited its coverage to non-owned autos used in connection with the insured's business. Nuvell sought to repossess a truck and contacted Renaissance, which in turn contacted Renovo, a repossession company, to pick up the truck. The tow truck, which was driven by an independent contractor, struck and killed an individual during the course of the

repossession. The appellate court ruled that Renaissance was entitled to coverage under its policy because its business consisted of being a forwarding company that facilitated communication between finance companies like Nuvell and tow truck drivers. Thus, even though the tow truck driver was not an employee of Renaissance or Renovo, he was considered to be using his vehicle in furtherance of Renaissance's business.

In *Bamber v. Lumbermens Mutual Casualty Company*, 680 A.2d 901 (Pa. Super. Ct. 1996), the appellate court held that an employee's personal vehicle, when it was used in the course of his employment, was covered by the non-owned auto provision of his employer's policy because it was being used in connection with the employer's business. But this case does not stand for the proposition that the non-owned auto provision is confined solely to employees.

In *Wausau Underwriters Insurance Company v. Baillie*, 281 F. Supp. 2d 1307, 1316 (M.D. Fla. 2002), *aff'd sub nom. Wausau Underwriters Insurance v. Baillie*, 82 F. App'x 218 (11th Cir. 2003), the insurance provision at issue specified that it applied to employees only, stating "[a]ny employee of yours is an 'insured' while using in your business or your personal affairs a covered 'auto' you don't own, hire or borrow[.]" Had Whispering Brook wished to confine liability to its own employees, similar language could have been incorporated into its policy with First Specialty.

In *Lawler v. Fireman's Fund Insurance Company*, 163 F. Supp. 2d 841, 851 (N.D. Ohio 2001), *aff'd*, 322 F.3d 900 (6th Cir. 2003), the federal district court addressed whether a commercial general liability policy qualified as a motor vehicle policy subject to Ohio statutes, which would have required the insurer to offer underinsured motorist coverage for non-owned autos that qualified for coverage under the policy. The language of the policy is significantly distinguishable from that of the First Specialty policy, in that it expressly defined insureds "as those employees 'only for acts within the scope of their employment for you [the employer][.]'" *Id.* at 856. The policy specifically narrowed those insured "to executive officers, directors, and trustees, but only with respect to their duties as officers, directors, or trustees, and employees, but only for acts within the scope of their employment." *Id.* The First Specialty policy simply does not contain this type of limiting language.

In *Bartolomucci v. Federal Insurance Company*, 770 S.E.2d 451, 457 (Va. 2015), the appellate court addressed whether a partner in a law firm involved in a collision commuting from his home to the firm's office constituted use in the affairs of the business under an insurance policy. The appellate court ruled that driving to work was a private activity for purposes of coverage. By contrast, there is no dispute that Tanzilla was at work when the accident occurred.

First Specialty's contention that the Non-owned Auto Endorsement limits coverage solely to employees of Whispering Brook and cannot extend to the employee of an independent contractor is not supported by the plain language of the policy, by our case law, or by the case law of other jurisdictions.

Finally, as further support for its argument that "in your business" is intended to limit policy coverage solely to employees' negligence while acting in the scope of their employment and cannot be extended to include the employee of an independent contractor, First Specialty points to the fact that the claims against Whispering Brook were dismissed by the plaintiffs with prejudice in an agreed order stating that there was no general agency relationship or vicarious liability between Whispering Brook and Alltrade, Tanzilla, and/or Key. But tort liability is not synonymous with insurance coverage. The parties' decision to dismiss certain claims in the lawsuit does not govern the interpretation of the insurance contract. "[A]llegations in a complaint are not by themselves sufficient to trigger the duty to defend [on the part of an insurer], but rather, the obligation to defend arises out [of] the language of the insurance contract." *Rockford*, 509 F. Supp. 3d at 964 (quoting *Dibeneditto v. Medical Protective Co.*, 3 F. App'x 483, 485 (6th Cir. 2001) (*per curiam*) and citing *Thompson v. West American Ins. Co.*, 839 S.W.2d 579, 581 (Ky. App. 1992)). The settlement agreement resolved issues of tort liability. As Motorists has argued, determining that Tanzilla's operation of his vehicle was in

connection with Whispering Brook's business does not require a finding of agency or of liability on the part of Whispering Brook because there is no such requirement in the policy.

**ii. Key and Alltrade were insureds under the Non-owned Auto Endorsement and Alltrade was entitled to coverage under Coverage A.**

First Specialty's next argument concerns the coverage of Alltrade and Key under the policy and a conflict between the Auto Exclusion and the Non-owned Auto Endorsement. The circuit court held that Alltrade qualified as an "insured" under the definition found in Coverage A, which includes "[a]ny person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager" when the loss occurred. The circuit court further determined that the Auto Exclusion in that section did not apply to Alltrade. The Auto Exclusion excludes coverage for "bodily injury" arising out of "the ownership, maintenance, use or entrustment of any . . . 'auto' . . . owned or operated by or rented or loaned to any insured[.]" The circuit court determined that this Exclusion did not apply to Alltrade because neither Alltrade nor anyone else meeting the definition of an "insured" under Coverage A owned or operated the auto that caused the loss. The circuit court acknowledged that this conclusion appeared to contradict its determination that Tanzilla was an insured under the Non-owned Auto Endorsement. It concluded, however, that the policy was ambiguous in failing to specify whether an 'insured' under the Non-owned Auto

Endorsement qualifies as 'any insured' under the Auto Exclusion. It noted that the Non-owned Auto Endorsement "does not purport to modify any of the coverages in Section I (other than by expanding them to include losses arising out of the use of a 'non-owned' auto), which is where Coverage A and the Auto Exclusion are located." The circuit court resolved the ambiguity in favor of granting coverage to Allstate.

The circuit court determined that Alltrade could also qualify as an insured under the Non-owned Auto Endorsement because it could be held liable for the conduct of another "insured" (Tanzilla) operating a "covered auto" (his truck) with the permission of a named insured (Whispering Brook).

In regard to Key, the circuit court found he was entitled to coverage under the Non-owned Auto Endorsement because, like Alltrade, he could be held liable for the conduct of another "insured" (Tanzilla) operating a "covered auto" (Tanzilla's truck) with the permission of a named insured (Whispering Brook).

First Specialty argues that these determinations are erroneous because they are dependent on the prior determination that Tanzilla is an insured under the Endorsement. As we have already affirmed the circuit court's determination that Tanzilla was an insured under the Endorsement, this argument is moot. As to the apparent conflict between the Auto Exclusion in Section I and the Non-owned Auto Endorsement, under the well-established principle that "ambiguities are

-22-

construed in favor of coverage," *Kentucky Association of Counties All Lines Fund Trust v. McClendon*, 157 S.W.3d 626, 635 (Ky. 2005), we affirm the circuit court's analysis in regard to both Alltrade and Key.

First Specialty further argues that Alltrade was not covered as a "real estate manager" under Coverage A by operation of the Auto Exclusion because the trailer Tanzilla was towing was owned by Victoria Gardens which in turn is owned by Whispering Brook. There is some dispute about ownership of the trailer. As noted earlier in this Opinion, the circuit court's order stated that Alltrade and Motorists both asserted that the trailer was owned by Alltrade. In any event, the circuit court rejected First Specialty's argument because there was no allegation or evidence that the trailer played any part in causing the collision with the victim. First Specialty has not offered any evidence to refute the circuit court's conclusion and consequently this part of its judgment will not be reversed.

**B. The "other insurance" clause in the First Specialty policy is a nonstandard escape clause which takes precedence over the excess clause in the Motorists policy**.

First Specialty's next argument concerns the circuit court's interpretation of the "other insurance" provisions found in both insurance contracts. These provisions define liability and priority of coverage if there are other potential sources of insurance coverage available. For purposes of this appeal, we are concerned with three types of "other insurance" provisions: the escape clause, the excess clause, and the nonstandard escape clause.

A standard escape clause simply negates "any liability if 'other valid and collectible insurance' is available to the [insured]." *Government Emp. Ins. Co. v. Globe Indem. Co.*, 415 S.W.2d 581, 582 (Ky. 1967). "Such clauses are viewed as contrary to public policy because they could operate to create a complete forfeiture of coverage." *Great American Ins. Co. v. Lawyers Mut. Ins. Co. of Kentucky*, 492 F. Supp. 2d 709, 714 (W.D. Ky. 2007).

An excess clause provides that the insurer will pay for a loss but only after any primary coverage available from another insurer has been exhausted. *Motorists Mut. Ins. Co. v. Glass*, 996 S.W.2d 437, 453 (Ky. 1997), *as modified* (Feb. 18, 1999), *holding modified by Hollaway v. Direct General Insurance Company of Mississippi, Inc.*, 497 S.W.3d 733 (Ky. 2016) (citing *Ohio Cas. Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 511 S.W.2d 671, 674 (Ky. 1974)). Unlike an escape clause, an excess clause "does not attempt to escape liability in its entirety where other insurance is applicable but merely calls for a reduction of the policy limits to the extent of payments made by the other insurance[.]" 46 C.J.S. *Insurance* § 1621.

The third type of "other insurance" provision is the nonstandard escape clause. It denies liability if other insurance is available, just like a standard escape clause, but further specifies that this other insurance may be either primary or excess. This addition "means that the [insurer] anticipated the possibility of the

existence of an 'excess insurance' clause in the driver's insurance policy, and expressly contracted against liability in that situation." *Government Emp. Ins. Co. v. Globe Indem. Co.*, 415 S.W.2d 581, 582 (Ky. 1967) ("*Geico*").

In terms of priority of coverage, "where two insurance companies are contesting primary liability, and one policy contains a non-standard escape clause while the other contains an excess clause, the escape clause prevails over the excess clause." *Empire Fire and Marine Ins. Co. v. Haddix*, 927 S.W.2d 843, 845 (Ky. App. 1996).

Where both policies contain excess clauses, they "are deemed mutually repugnant and each policy should provide pro rata coverage." *Great American Ins. Co. v. Lawyers Mut. Ins. Co. of Kentucky*, 492 F. Supp. 2d 709, 712-13 (W.D. Ky. 2007) (citations omitted).

The "other insurance" clause in the Motorists policy is located in the Business Auto Coverage Form and provides: "For any covered 'auto' you own, this Coverage Form provides primary insurance. **For any covered 'auto' you don't own, the insurance provided by this Coverage Form is excess over any other collectible insurance**[.]" (Emphasis supplied.)

The First Specialty "other insurance" clause is located in Section IV of the CGL Form. It states in pertinent part:

4. Other Insurance

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

    a.    Primary Insurance

    This insurance is primary except when Paragraph b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph c. below.

    b.    Excess Insurance

        (1) **This insurance is excess over** . . . **[a]ny of the other insurance, whether primary, excess, contingent or any other basis** . . . if the loss arises out of the maintenance or use of 'autos' . . . to the extent not subject to Exclusion g of Section 1 – Coverage A – Bodily Injury and Property Damage Liability."

(Emphasis supplied.)

The circuit court determined that these are mutually repugnant "excess" clauses requiring a pro rata division between First Specialty and Motorists of the costs of defending and indemnifying the insureds.

Neither side disputes that the clause in the Motorists policy is an excess clause. First Specialty argues that the "other insurance" clause in its policy,

-26-

however, is a nonstandard escape clause which takes precedence over the excess clause in the Motorists policy. We agree. *Geico.*, 415 S.W.2d at 581, and *Haddix*, 927 S.W.2d at 845.

In *Geico*, the appellee driver was involved in an accident while driving a loaner vehicle owned by a car dealer. The driver's policy contained an excess insurance clause, which "provided that in the case of a loss arising out of use by the insured of a nonowned automobile the policy would be 'excess insurance over any other valid and collectible insurance.'" *Geico*, 415 S.W.2d at 581. The dealer's policy contained an excess clause and also an escape clause in an endorsement "which provided in effect that the policy would not cover a person other than the named insured and his employees, if other valid and collectible insurance, 'either primary or excess' . . . was available to such person." *Id*.

Kentucky's highest court held that the nonstandard escape clause in the owner's policy took precedence over the excess clause in the driver's policy. It stated:

> The distinguishing feature of the owner's policy . . . is that its 'escape' clause is not standard; it denies liability if other insurance, [either] primary or excess, is available to the driver. This means that the owner's insurer anticipated the possibility of the existence of an 'excess insurance' clause in the driver's insurance policy, and expressly contracted against liability in that situation.

*Id*. at 582.

The Court concluded that "the clause was a valid, express condition against liability and that the owner's insurer therefore was not liable where the driver's policy contained an 'excess insurance' clause." *Id*.

The appellee in *Haddix* was similarly involved in an accident while driving a loaner vehicle owned by a car dealer. The driver's auto insurance policy contained the following clause: "*Other Insurance*: If there is other applicable liability insurance we will pay only our share of the loss. Our share is the proportion that our limit of liability bears to the total of all applicable limits. However, any insurance we provide for a vehicle you do not own shall be excess over any other collectible insurance." *Haddix*, 927 S.W.2d at 845.

The dealer's policy stated in pertinent part: "*Other Insurance*: For any covered 'auto,' the insurance provided by this policy is excess over any other collectible insurance or 'self insurance' available to 'you,' any 'member' or any 'insured,' whether such insurance or 'self insurance' is primary, excess or contingent." *Id*.

Relying on *Geico*, this Court ruled that the nonstandard escape clause in the dealer's policy took precedence, stating:

> The [dealer's] policy disclaims liability where there is other applicable insurance, regardless of whether the other available insurance is primary, excess, or contingent. Where two insurance companies are contesting primary liability, and one policy contains a non-standard escape clause while the other contains an

-28-

> excess clause, the escape clause prevails over the excess clause.

*Id.*

The "other insurance" clause in the First Specialty policy is virtually identical to the nonstandard escape clause identified in *Haddix*. Under this clear precedent, it must prevail over the excess clause in the Motorists policy.

Finally, First Specialty argues that public policy considerations should require its policy to be treated as excess over the Motorists policy. This argument is rendered moot by our decision on the merits.

## CONCLUSION

The Jefferson Circuit Court's grant of summary judgment is affirmed in full except as to its holding that the First Specialty policy contains an escape clause which is mutually repugnant with the escape clause in the Motorists policy and requires First Specialty and Motorists to share primary liability on a pro rata basis. The matter is remanded for entry of an order reflecting that the First Specialty policy contains a nonstandard escape clause and consequently its coverage is excess over the coverage of the Motorists policy.

ALL CONCUR.

BRIEFS FOR APPELLANT:            BRIEF FOR APPELLEES:

J. Phillip Fraley               Michell L. Burden
John R. Catizone                David W. Zahniser
Barboursville, West Virginia    Fort Mitchell, Kentucky